# DEBRA HUMMEL *v.* MARTEN TRANSPORT, LTD., ET AL.
## (SC 17494)
## (SC 17496)

Borden, Norcott, Katz, Palmer, Vertefeuille,
Zarella and Bishop, Js.[1]

[1] This case originally was argued on April 12, 2006, before a panel of this court consisting of Justices Borden, Norcott, Katz, Palmer and Vertefeuille. Thereafter, on July 13, 2006, the court, pursuant to Practice Book § 70-7 (b), ordered, sua sponte, that the case be considered en banc. Accordingly, Justice Zarella and Judge Bishop were added to the panel, and they have read the record, briefs and transcript of the oral argument.

Argued April 12, 2006—officially released May 22, 2007

*Albert E. Desrosiers*, with whom, on the brief, was *Michael Feola,* for the appellant in the first case, appellee in the second case (plaintiff).

*William F. Gallagher*, with whom were *Erica W. Todd*, and, on the brief, *Joseph F. Trotta* and *Hugh D. Hughes*, for the appellees in the first case, appellants in the second case (defendants).

*Andrew M. Dewey* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*James Moran* and *Robert F. Carter* filed a brief for the Connecticut Trial Lawyers Association et al. as amici curiae.

*Opinion*

PALMER, J. This certified appeal raises two principal issues: (1) whether, under the plain meaning rule of recently enacted General Statutes § 1-2z,[2] we are obliged to overrule our precedent importing a final judgment requirement into General Statutes § 31-301b,[3] which governs appeals from the compensation review board (board) to the Appellate Court, because § 31-301b does not refer to such a requirement; and (2) if not, whether we nevertheless should reconsider and abandon our long-standing interpretation of § 31-301b as containing a final judgment requirement. The plaintiff, Debra Hummel, sought survivor's benefits pursuant to General Statutes § 31-306 following the death of her husband, Henry Hummel, an employee of the named

---

[2] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

Section 1-2z became effective on October 1, 2003. See Public Acts 2003, No. 03-154, § 1.

[3] General Statutes § 31-301b provides: "Any party aggrieved by the decision of the Compensation Review Board upon any question or questions of law arising in the proceedings may appeal the decision of the Compensation Review Board to the Appellate Court."

defendant, Marten Transport, Ltd. (Marten). The workers' compensation commissioner for the fifth district (commissioner) found that the plaintiff was entitled to survivor's benefits but did not determine the amount of benefits to which she was entitled. Marten and its insurer, the defendant Crawford and Company,[4] appealed from the decision of the commissioner to the board, which affirmed the commissioner's finding of compensability. The defendants appealed from the board's decision to the Appellate Court, which dismissed the appeal on the ground that the decision of the board was not a final judgment because the board had not determined the amount of benefits to be paid. *Hummel* v. *Marten Transport, Ltd.*, 90 Conn. App. 9, 14, 15, 875 A.2d 575 (2005). We granted the parties' petitions for certification to appeal,[5] limited to the issue of whether the Appellate Court properly had dismissed the defendants' appeal. *Hummel* v. *Marten Transport, Ltd.*, 275 Conn. 913, 882 A.2d 671 (2005). On appeal to this court, the parties claim that the Appellate Court improperly concluded that the decision of the board is not an appealable final judgment for purposes of § 31-301b. The parties also claim that, if the Appellate Court correctly concluded that the decision of the board is not a final judgment, the legislature effectively has overruled our precedent incorporating a final judgment requirement into § 31-301b by virtue of its enactment of § 1-2z because the plain language of § 31-301b does not contain such a requirement. The parties further contend that, even if the legislature has not overruled our precedent importing a final judgment requirement into § 31-301b, we should do so because there is no indication that the legislature intended to impose that

---

[4] We hereinafter refer to Marten and Crawford and Company collectively as the defendants.

[5] We note that the plaintiff and the defendants sought and were granted certification to appeal from the judgment of the Appellate Court dismissing the defendants' appeal.

jurisdictional requirement on workers' compensation appeals. We reject the parties' claims and, therefore, affirm the judgment of the Appellate Court.

The following facts and procedural history are set forth in the opinion of the Appellate Court. "The commissioner found the following facts [in connection with the plaintiff's claim for survivor's benefits]. The plaintiff's husband, Henry Hummel, was a cross-country driver of an eighteen wheel tractor trailer for Marten. He was found dead in the sleeper cab of his truck on November 25, 1997. He had returned home from a cross-country trip early in the afternoon of November 24, 1997, looking dirty, tired and agitated. He had a heated dispute with a Marten official over the telephone about whether he was entitled to be paid following an apparent problem with the paperwork that he had submitted earlier. [According to the plaintiff] she had known her late husband for more than thirty years and had never seen him in such an agitated state. She feared he would have a heart attack. Following a shower and some rest, he left home between 10 p.m. and 11 p.m. He parked near his drop off point in Waterbury so that he could sleep and then drop off his load early the next morning. He died in the sleeper cab before morning.

"The commissioner also found that Marten had urged Henry Hummel to drive as much as possible. [Henry Hummel] falsified his log books to hide from the transportation authorities the number of hours he drove. On the three week trip completed shortly before his death, he had driven an average of 569 miles per day, and it was not unusual for him to drive 5000 miles in a week. He slept only two or three hours a day and never exercised. He did not eat a proper diet, nor did he eat on a regular schedule. He was a lifelong smoker and sometimes used cigars to wake himself up by burning his fingers when he fell asleep while driving. He was sixty-four years old at the time of his death.

"The commissioner concluded that '[t]he stress of [Henry Hummel's] job and its limitations on his time for other activities [were] . . . substantial factor[s] in the chain of events which led to [his] fatal ischemic heart disease.' The commissioner accordingly ordered the payment of benefits pursuant to . . . § 31-306, which provides for the manner in which benefits are paid to dependents following death resulting from an accident or occupational disease. The commissioner did not determine the amount of benefits to be paid.

"The defendants appealed to the board, claiming that the plaintiff [had] failed to prove within a reasonable degree of medical probability that [Henry Hummel's] employment was a substantial factor in the cause of his death. The board reviewed all of the testimony, including that of two medical experts, and concluded that an adequate evidentiary basis existed for the commissioner's finding of compensability. The board did not issue a remand order from its decision despite the [commissioner's] failure to determine the amount of the award. Thereafter, the defendants appealed to [the Appellate Court], raising the same sufficiency of the evidence claim." *Hummel* v. *Marten Transport, Ltd.*, supra, 90 Conn. App. 10–12.

Following the defendants' appeal to the Appellate Court, it came to the attention of that court that, after the board upheld the commissioner's finding of compensability and did not issue a remand order to determine the specific amount of benefits, "the plaintiff . . . brought [a] separate proceeding [before the commissioner] to determine, among other things, the amount of benefits to be paid. In addition to the calculation of [survivor's] benefits, the plaintiff sought an order pursuant to General Statutes § 31-301 (f)[6] that the defen-

---

[6] General Statutes § 31-301 (f) provides: "During the pendency of any appeal of an award made pursuant to this chapter, the claimant shall receive all compensation and medical treatment payable under the terms of the award to the extent the compensation and medical treatment are not being

dants pay her benefits [during the pendency of] this appeal and sought the imposition of penalties under General Statutes §§ 31-300 and 31-303. The commissioner entered the § 31-301 (f) order and held open the issue of penalties. The defendants responded by raising the issue of whether, under General Statutes [Rev. to 1997] § 31-307 (e),[7] any benefits to which the plaintiff was entitled would be offset by social security old age insurance benefits that the defendants claim the plaintiff receives. After the commissioner issued his decision, the board heard another appeal on the issues related to the award, penalties and offsets, and issued a remand order for a final calculation of benefits." Id., 12–13.

In light of the separate benefits proceeding, which was ongoing, the Appellate Court, sua sponte, raised the issue of whether the defendants had appealed from a final judgment. Thereafter, both the plaintiff and the defendants appeared before the Appellate Court for oral argument on the defendants' appeal and argued that the board's decision from which the defendants were appealing was an appealable final judgment under this court's decision in *Hunt* v. *Naugatuck*, 273 Conn. 97, 868 A.2d 54 (2005).[8] The Appellate Court disagreed

---

paid by any health insurer or by any insurer or employer who has been ordered, pursuant to the provisions of subsection (a) of this section, to pay a portion of the award. The compensation and medical treatment shall be paid by the employer or its insurer."

[7] General Statutes (Rev. to 1997) § 31-307 (e) provides: "Notwithstanding any provision of the general statutes to the contrary, compensation paid to an employee for an employee's total incapacity shall be reduced while the employee is entitled to receive old age insurance benefits pursuant to the federal Social Security Act. The amount of each reduced workers' compensation payment shall equal the excess, if any, of the workers' compensation payment over the old age insurance benefits."

[8] In *Hunt* v. *Naugatuck*, supra, 273 Conn. 97, the board determined that the claimant had suffered a compensable work-related injury, namely, hypertension, but did not determine the benefits to which the claimant was entitled because he had not yet suffered any actual financial loss as a result of his injury. See id., 101. We concluded that the employer's appeal from the decision of the board to the Appellate Court constituted a final judgment

and, accordingly, dismissed the defendants' appeal.[9] *Hummel* v. *Marten Transport, Ltd.*, supra, 90 Conn. App. 14, 15.

We granted the parties' petitions for certification to appeal, limited to the following issue: "Did the Appellate Court properly dismiss this appeal for lack of a final judgment?" *Hummel* v. *Marten Transport, Ltd.*, supra, 275 Conn. 913. The case originally was argued before a panel of five justices. At that time, both the plaintiff and the defendants maintained that the Appellate Court incorrectly had concluded that the decision of the board does not constitute a final judgment. Thereafter, this court, sua sponte, ordered that the case be considered en banc. In addition, we ordered the parties, and invited the amici curiae,[10] to file supplemental briefs on the issue of whether we should overrule our holding in *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 297–98, 695 A.2d 1051 (1997), in which we reaffirmed our prior case law importing a final judgment requirement into § 31-301b. In particular, we sought the views of the parties and amici as to whether the plain meaning rule embodied in § 1-2z requires us to overrule our case law interpreting § 31-301b as containing a final judgment requirement. We now reject the parties' claim that the board's decision is an appealable final judgment. We also reject the parties' contention that § 1-2z overrules our prior precedent construing § 31-301b to require a

---

for purposes of § 31-301b. Id., 105. We reasoned that, because the claimant had brought his claim solely to protect against the running of the applicable statute of limitations and before he had suffered any economic loss due to his hypertension, a remand by the board to the commissioner for further proceedings would have been unnecessary. Id.

[9] As the Appellate Court noted, "[b]ecause the requirement of a final judgment implicates [the court's] subject matter jurisdiction . . . the parties' willingness to proceed [was] insufficient." *Hummel* v. *Marten Transport, Ltd.*, supra, 90 Conn. App. 13.

[10] The Connecticut Trial Lawyers Association, the Workers' Compensation Section of the Connecticut Bar Association and the Connecticut Defense Lawyers Association have appeared as amici curiae.

final judgment. Finally, we decline the parties' invitation to reconsider and abandon our construction of § 31-301b as containing a final judgment requirement.

## I

We first consider the parties' claim that the decision of the board is an appealable final judgment. Before addressing the merits of this claim, however, we set forth the governing legal principles, which we recently summarized in *Hunt* v. *Naugatuck*, supra, 273 Conn. 97. "[U]nder General Statutes § 31-301b, [a]ny party aggrieved by the decision of the [board] upon any question or questions of law arising in the proceedings may appeal the decision of the [board] to the Appellate Court.

"We have stated, however, that the Appellate Court's review of disputed claims of law and fact ordinarily must await the rendering of a final judgment by the [board]. *Szudora* v. *Fairfield*, 214 Conn. 552, 556, 573 A.2d 1 (1990). When the board remands a case to the commissioner for further proceedings in connection with the challenged award, the finality of the board's decision is called into question . . . . Id. In such circumstances, [t]he test that determines whether such a decision is a final judgment turns on the scope of the proceedings on remand: if such further proceedings are merely ministerial, the decision is an appealable final judgment, but if further proceedings will require the exercise of independent judgment or discretion and the taking of additional evidence, the appeal is premature and must be dismissed. Id. Finally, because the existence of a final judgment is a jurisdictional prerequisite to an appeal, the reviewing court may dismiss a case on that ground even if the issue was not raised by the parties." (Internal quotation marks omitted.) *Hunt* v. *Naugatuck*, supra, 273 Conn. 104–105.

We conclude that the Appellate Court properly applied these principles in concluding that the decision of the board in the present case is not an appealable final judgment. As the Appellate Court aptly explained: "Although two separate proceedings were brought, the first to determine compensability and the second to determine the award, the board's ruling on compensability merely was a step along the road to a final judgment. Essentially, the two proceedings the plaintiff has brought will result in one final judgment. Following the appeal on the issue of compensability, the board impliedly remanded the matter for proceedings to determine the amount of the award. Following the award proceeding, the board explicitly remanded the matter to the commissioner with directions. Because the matter currently is on remand to the commissioner, [the court applies] the *Szudora* test to determine whether this appeal may proceed despite the remand order. It cannot. The proceedings on remand will require the commissioner to exercise independent judgment to determine the question of law of whether the social security offset of [General Statutes (Rev. to 1997)] § 31-307 (e) applies to the plaintiff in this case. Furthermore, in order to determine whether and to what extent the plaintiff receives social security old age insurance benefits, further evidence will be required." *Hummel* v. *Marten Transport, Ltd.*, supra, 90 Conn. App. 14.

The parties claim, as they did in the Appellate Court, that *Hunt* v. *Naugatuck*, supra, 273 Conn. 97, supports their contention that the defendants have appealed from a final judgment of the board. In *Hunt*, the plaintiff, Ronald Hunt, was employed as a police officer by the defendant, the borough of Naugatuck (Naugatuck). Id., 98. Hunt filed a notice of claim for heart and hypertension benefits after discovering that he had hypertension but before he had suffered any compensable loss. See id., 99–101, 105. The commissioner determined that

Hunt was entitled to benefits under General Statutes § 7-433c, and the board affirmed the commissioner's decision. Id., 100–102. Naugatuck appealed from the decision of the board to the Appellate Court, which, sua sponte, ordered counsel "to appear and give reasons, if any, why the appeal should not be dismissed for lack of a final judgment because the decision of the . . . board appears to contemplate that further proceedings before the trial commissioner involving the calculation of benefits for [Hunt] will occur that may require the taking of additional evidence and the exercise of discretion." (Internal quotation marks omitted.) Id., 102. Following the hearing, the Appellate Court dismissed Naugatuck's appeal for lack of a final judgment. Id. Thereafter, Naugatuck filed a petition for certification to appeal to this court, which we granted limited to the issue of whether the Appellate Court properly had dismissed Naugatuck's appeal. See *Hunt* v. *Naugatuck*, 269 Conn. 916, 852 A.2d 742 (2004).

We answered the certified question in the negative, stating: "It is clear that the board's decision affirming the commissioner's award was a final judgment. In reaching our conclusion, we note that [Hunt] was not seeking an award of specific monetary benefits when he filed his [notice] . . . because his hypertension had not ripened into a partial or total disability. Rather, [Hunt's] motivation for filing the [notice] when he did was to bring his claim within the statute of limitations period and to alert his employer that he had developed a condition . . . that could spawn a claim for monetary benefits in the future. The commissioner's finding and award, therefore, merely involved a determination that [Hunt] was entitled to receive benefits . . . should he later sustain a compensable loss. The board's decision affirming the commissioner's award resolved that issue conclusively in favor of [Hunt], and, therefore, it was not necessary to remand the case to the commissioner

for further proceedings. Thus, under the principles announced in *Szudora* v. *Fairfield*, supra, 214 Conn. 556, the board's decision was a final judgment that was sufficient to invoke the jurisdiction of the Appellate Court." *Hunt* v. *Naugatuck*, supra, 273 Conn. 105.

We agree with the Appellate Court that the factual and procedural scenario presented in *Hunt* is materially different from that presented in this case. In particular, Hunt did not seek an award of benefits; rather, he merely sought a determination that he was entitled to such an award *at some unspecified time in the future* if and when he actually realized a compensable loss due to his hypertension. In other words, the only issue before the commissioner in *Hunt* was whether Hunt would be entitled to benefits "should he *later* sustain a compensable loss." (Emphasis added.) Id., 105. In the present case, by contrast, the plaintiff is seeking a determination that she is entitled to survivor's benefits *and* a determination regarding the amount of those benefits.

The parties also claim that when, as in the present case, the board affirms a finding of compensability without expressly remanding the case for a determination of benefits, the decision should be deemed a final judgment for purposes of appeal because, unlike an award of benefits, a decision on compensability is not subject to later reevaluation. Although we agree with the plaintiff that a decision regarding compensability is final in ways that an award of benefits is not; see, e.g., id., 106 ("a claimant's benefits are always subject to modification as his or her condition changes"); we see no reason to retreat from the functional, case-by-case test that we adopted in *Szudora* for evaluating the finality of a decision of the board. See id., 107.

The parties further contend that it is unreasonable to require a party to determine whether a decision of

the board is final for purposes of appeal when the decision itself contains no remand order. Specifically, the plaintiff maintains that it is unfair to expect a party to be able to ascertain whether a case has been remanded impliedly, and that a party confronted with the difficulty inherent in determining whether a case has been remanded by implication is likely to feel compelled to appeal virtually any decision that does not contain express remand language solely to safeguard his or her appeal rights. We acknowledge that it is preferable for the board to use explicit remand language when, in light of the decision of the board, further proceedings before the commissioner are necessary. Nevertheless, we are confident that parties ordinarily will have little difficulty in ascertaining when such proceedings are contemplated even if the board decision is silent in that regard.

Finally, the parties assert that, although compensability was the sole issue addressed by the commissioner and the board, the defendants must be permitted to take an immediate appeal from the decision of the board because, under General Statutes § 31-301a,[11] any such "decision" becomes final after the expiration of twenty days from the issuance of notice of the decision. We disagree.

"General Statutes §§ 31-301a and 31-301b govern the finality of workers' compensation awards, which become final when and if the parties fail to appeal within the statutory time period." *Marone* v. *Waterbury*, 244 Conn. 1, 13, 707 A.2d 725 (1998). General Statutes § 31-301a provides that, in the absence of an appeal, "[a]ny decision" of the board shall become final after the expiration of twenty days from the issuance of notice of

---

[11] General Statutes § 31-301a provides: "Any decision of the Compensation Review Board, in the absence of an appeal therefrom, shall become final after a period of twenty days has expired from the issuance of notice of the rendition of the judgment or decision."

the decision. As we have explained, however, under § 31-301b, an appeal may be taken only from a final judgment of the board. E.g., *Conetta* v. *Stamford*, 246 Conn. 281, 290, 715 A.2d 756 (1998). Whether a final judgment exists, in turn, is determined by application of the test set forth in *Szudora*. When § 31-301a is read together with § 31-301b, therefore, it is clear that only a board decision that qualifies as a final judgment is subject to the twenty day limitation period of § 31-301a. In other words, for purposes of *both* § 31-301a *and* § 31-301b, "[a]ny decision" of the board includes only those decisions that constitute a final judgment as we have defined that term in *Szudora*. So construed, the two statutory provisions are fully consistent with one another.

## II

We turn next to the parties' claim that the legislature, by virtue of its enactment of § 1-2z, effectively has over-ruled our precedent importing a final judgment requirement into § 31-301b. Specifically, the parties contend that, because § 31-301b contains no language to suggest that only a board decision that constitutes a final judgment may be appealed to the Appellate Court, the plain meaning rule of § 1-2z bars us from construing § 31-301b in such a manner. Thus, under the view advanced by the parties, our interpretation of § 31-301b is governed by its plain and unambiguous language, which permits an appeal from a decision of the board "upon any question or questions of law arising in the proceedings . . . ."[12] We reject the parties' claim.

To place the parties' contention in proper context, we commence our consideration of their claim with a

---

[12] We note that amici; see footnote 10 of this opinion; also have urged us to adopt an interpretation of § 31-301b that dispenses with the final judgment requirement.

brief overview of the case law interpreting § 31-301b as requiring an appeal from a final judgment of the board. The first case to impose a final judgment requirement under § 31-301b was *Timothy* v. *Upjohn Co.*, 3 Conn. App. 162, 485 A.2d 1389 (1985). In that case, the Appellate Court held that, because the decision of the compensation review division, now the compensation review board, was not a final judgment, the court had no subject matter jurisdiction to hear an appeal from that decision.[13] Id., 164. Several years later, in *Repasi* v. *Jenkins Bros.*, 16 Conn. App. 121, 123–24, 546 A.2d 965, cert. denied, 209 Conn. 817, 550 A.2d 1085 (1988), the Appellate Court, following its holding in *Timothy*, dismissed an appeal from the compensation review division for lack of a final judgment.[14]

This court first imported a final judgment requirement into § 31-301b in *Matey* v. *Estate of Dember*, 210 Conn. 626, 556 A.2d 599 (1989). In *Matey*, the second injury and compensation assurance fund (fund)

---

[13] In *Timothy*, the Appellate Court did not consider the language, history or purpose of § 31-301b. See generally *Timothy* v. *Upjohn Co.*, supra, 3 Conn. App. 163–65. Rather, the court based its decision that a final judgment was a jurisdictional prerequisite for appellate subject matter jurisdiction on three provisions of the appellate rules, namely, Practice Book, 1978–97, §§ 2015, 2021 and 3000. See *Timothy* v. *Upjohn Co.*, supra, 163–64. Although it may not have been clear at that time, it subsequently has become clear that our rules of practice do not and can not impose or limit subject matter jurisdiction. See, e.g., *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 286, 914 A.2d 996 (2007) ("subject matter jurisdiction is, with certain constitutional exceptions . . . a matter of statute, not judicial rule making"); *State* v. *Lawrence*, 281 Conn. 147, 155, 913 A.2d 428 (2007) ("Practice Book rules do not ordinarily define subject matter jurisdiction. General Statutes § 51-14 [a] authorizes the judges of the Superior Court to promulgate rules regulating pleading, practice and procedure in judicial proceedings . . . . Such rules shall not abridge, enlarge or modify any substantive right nor the jurisdiction of any of the courts." [Internal quotation marks omitted.]).

[14] The court in *Repasi* did not engage in any analysis of § 31-301b; it simply applied *Timothy* as a matter of stare decisis. See *Repasi* v. *Jenkins Bros.*, supra, 16 Conn. App. 122–24.

appealed from a decision of the compensation review division, which affirmed the finding of the commissioner as to the fund's liability to the claimant but remanded the case for further proceedings before the commissioner with respect to the amount of the award. Id., 627. Although the claimant had not challenged the appealability of the board's decision, we followed the holding of *Repasi* in concluding, first, that only a final judgment is appealable under § 31-301b,[15] and, second, that the fund's appeal was premature in light of the board's remand order directing the commissioner to conduct a further evidentiary hearing for the purpose of determining the correct amount of the award. Id., 629–31. We therefore dismissed the fund's appeal for lack of a final judgment. Id., 631.

Approximately one year later, in *Szudora* v. *Fairfield*, supra, 214 Conn. 556, we expressly reaffirmed our holding in *Matey*, stating that "[i]t is axiomatic that appellate review of disputed claims of law and fact ordinarily must await the rendering of a final judgment by the [board]." Relying on our reasoning in *Matey*, we also explained that whether a decision of the board is a final judgment depends on "the scope of the proceedings on remand . . . ." Id. The board's decision is an appealable final judgment when only a ministerial proceeding is necessary on remand, whereas the board's decision is not a final judgment when the proceeding on remand requires the exercise of independent judgment and the taking of additional evidence by the commissioner. Id.

The following year, in *Cleveland* v. *U.S. Printing Ink, Inc.*, 218 Conn. 181, 184, 588 A.2d 194 (1991), we

---

[15] In reaching our conclusion in *Matey* that only an appeal from a final judgment is permitted under § 31-301b, we simply took as a given that *Repasi* had established the governing law requiring a final judgment for appellate subject matter jurisdiction in workers' compensation appeals. See *Matey* v. *Estate of Dember*, supra, 210 Conn. 629–30.

considered the claim that, "because . . . § 31-301b nowhere states that the decision appealed from must be final, a final decision [is] not required in order for [a party] to appeal [a] decision of the [board]." We rejected the claim, concluding that a final judgment "is a jurisdictional prerequisite to an appeal" under § 31-301b. Id.

Six years later, in *Hall* v. *Gilbert & Bennett Mfg. Co.*, supra, 241 Conn. 295, we again were asked to "overrule our previous [cases] interpreting § 31-301b to require a final decision by the board before such a decision may be appealed." The claim that we should overrule those prior cases, which was raised by the second injury fund, was predicated on the fact that the text of § 31-301b, unlike that of General Statutes §§ 4-183[16] and 52-263,[17] does not contain such a prerequisite. Id., 294–95.

We declined the fund's invitation to overrule our prior case law interpreting § 31-301b as requiring a final judgment. In doing so, we acknowledged that "the text of § 31-301b does not contain language requiring a final judgment in order for a party to appeal to the Appellate Court." Id., 295. We observed, however, that the legislative history of § 31-301b contained evidence indicating an intent by the legislature to allow appeals under § 31-

---

[16] General Statutes § 4-183, which governs appeals under the Uniform Administrative Procedure Act, provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[17] General Statutes § 52-263, which governs appeals from decisions of the Superior Court, provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

301b only from final judgments of the board. Id., 295–96. In resolving the issue of legislative intent posed by the second injury fund's claim, we relied primarily on two separate but related principles, namely, the doctrine of stare decisis and the tenet of statutory interpretation that counsels against overruling case law involving our construction of a statute if the legislature reasonably may be deemed to have acquiesced in that construction. See id., 296–97. Specifically, we explained: "The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value. . . .

"In evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. . . . More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsidera-

tion has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision. . . .

"The first of our decisions construing § 31-301b to require that a party appealing from a decision of the board must appeal from a final decision; [see] *Matey* v. *Estate of Dember*, supra, 210 Conn. 631; was rendered in 1989. In 1991, two years after *Matey* and one year after *Szudora* v. *Fairfield*, supra, 214 Conn. [552], the legislature enacted a comprehensive reform of the Workers' Compensation Act, yet only [e]ffected a non-substantive change to § 31-301b. See Public Acts 1991, No. 91-339, § 22 (P.A. 91-339) (substituting [term] review *board* for [term] review *division*). The legislature's failure to amend § 31-301b following our interpretation of it in *Matey* and *Szudora*, which both predated legislative consideration of P.A. 91-339, provides adequate support for our disinclination to overrule controlling precedent and thereby effect an amendment by the process of judicial interpretation. . . . The legislature is presumed to be aware of the interpretation [that] the courts have placed [on] one of its legislative enactments and of the effect that its own nonaction, thereafter, may have. . . . In short, the fund has not presented cogent reasons and inescapable logic that compel us to overrule our prior decisions interpreting § 31-301b." (Citations omitted; internal quotation marks omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.*, supra, 241 Conn. 296–98.

Almost ten years have elapsed since our refusal in *Hall* to overrule our prior precedent importing a final judgment requirement into § 31-301b, and the legislature has taken no action to amend that statutory section. Indeed, the legislature has not amended § 31-301b in the eighteen years that have passed since this court first construed § 31-301b to require a final judgment.

In 2003, however, the legislature enacted § 1-2z; see footnote 2 of this opinion; which prohibits the use of extratextual evidence of the meaning of a statute if the statutory text is plain and unambiguous and does not yield absurd or unworkable results. The parties contend that § 1-2z requires us to construe § 31-301b in accordance with its plain and unambiguous language. The parties further contend that, because § 31-301b does not expressly refer to a final judgment requirement, § 1-2z prohibits us from continuing to construe § 31-301b as containing such a requirement. In other words, under the view advanced by the parties, § 1-2z overrules our prior precedent importing a final judgment requirement into § 31-301b.

We acknowledge that, if we were writing on a clean slate, § 1-2z might foreclose us from reading a final judgment requirement into § 31-301b because the text of § 31-301b contains no such requirement. For the reasons that follow, however, we conclude that § 1-2z does not dictate the result that the parties urge.

As this court previously has observed, § 1-2z was enacted in response to our decision in *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003), in which we "explained that, as part of the judicial task of statutory interpretation, we would not follow the so-called plain meaning rule, which operates to preclude the court, in certain cases, from considering sources in addition to the statutory text in order to determine its meaning." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 686–87 n.20, 855 A.2d 212 (2005). Specifically, § 1-2z "has legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of [extratextual] sources of the meaning of legislative language . . . ." (Internal quotation marks omitted.) *Kinsey* v.

*Pacific Employers Ins. Co.*, 277 Conn. 398, 405 n.7, 891 A.2d 959 (2006). The issue raised by this appeal is whether, by its enactment of § 1-2z, the legislature also overruled our case law interpreting § 31-301b—or, for that matter, any other statutory provision—if we determine that our prior interpretation of § 31-301b differs from our interpretation of that provision under the plain meaning rule of § 1-2z.[18] In essence, therefore, we must decide whether, in applying § 1-2z to § 31-301b, we are barred from considering our prior construction of § 31-301b.

Our resolution of this issue depends on the meaning of § 1-2z itself. Of course, in ascertaining the meaning of § 1-2z as it applies to the present case, we must follow the dictates of § 1-2z just as we would if we were construing any other statute. We therefore turn to the language of § 1-2z, which, for purposes of ascertaining the meaning of § 1-2z itself, directs us first to consider its "text" and "its relationship to other statutes." We may look no further for evidence of the meaning of § 1-2z if, after examining its text and considering its relationship to other statutes, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results. General Statutes § 1-2z.

With respect to the meaning of the term "text" in § 1-2z,[19] the essential question is whether "text" means the words of the statute without regard to our prior construction of those words, or whether "text" includes that prior judicial interpretation of the statutory lan-

---

[18] Although this court generally applied the plain meaning rule before *Courchesne*, we sometimes did not do so even though the rule arguably was applicable to the statutory provision at issue. In fact, we did not expressly apply the rule in any of our prior cases construing § 31-301b. It is not surprising, therefore, that this court's interpretation of a particular statutory provision might yield one result prior to *Courchesne* and a different result under § 1-2z.

[19] We are not aware of any statutory provisions to which § 1-2z is related that shed light on the meaning of § 1-2z for purposes of the present case.

guage. Of course, if, for purposes of § 1-2z, the term "text" refers only to the words of the statute to be construed—in the present case, § 31-301b—without regard to our prior construction of the statutory provision, then we are prohibited from considering any such prior construction of the provision in ascertaining its meaning. As we have explained, in that case, the plain language of § 31-301b may dictate a result that is contrary to our prior interpretation of that provision that § 31-301b requires a final judgment as a precondition to an appeal from the board's decision. If, however, the term "text" refers to the words of the statute as we previously have construed them, then § 1-2z does not purport to overrule our case law construing § 31-301b.

Because the word "text" is not defined statutorily, we turn to General Statutes § 1-1 (a), which provides in relevant part: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." To ascertain that commonly approved usage, we look to the dictionary definition of the term. E.g., *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 678, 911 A.2d 300 (2006). The word "text" is defined generally as "the main body of printed or written matter on a page . . . ." Webster's Third New International Dictionary. The definition of the term "text" does not answer the question of whether, for purposes of § 1-2z, that term means the words of the statute as previously construed or whether it means the statutory wording without reliance on any prior judicial construction of that language. In other words, the term "text" is not plain and unambiguous with respect to the issue of statutory construction raised by this appeal. Consequently, we may consult extratextual sources to ascertain the meaning of § 1-2z, including its legislative history. It is evident from that history that the legislature, by virtue of its enactment of

§ 1-2z, did not intend to overrule our prior interpretation of any other statutory provision, including § 31-301b.

As we have indicated, § 1-2z was passed in response to this court's decision in *Courchesne*, in which a majority of this court rejected the plain meaning rule in favor of an interpretive framework that directs courts, "in *all* cases, to consider *all* of the relevant evidence bearing on the meaning of the language [of a statute]," without first having to cross the threshold of linguistic ambiguity. (Emphasis in original.) *State* v. *Courchesne*, supra, 262 Conn. 575. Shortly after the release of our decision in *Courchesne*, however, the House of Representatives unanimously passed House Bill No. 5033, entitled "An Act Concerning Statutory Interpretation," which subsequently was enacted and codified at § 1-2z. Representative John E. Stone, Jr., who introduced the bill on the floor of the House, described it as "a relatively simple proposal . . . in response to a Supreme Court decision . . . in which the . . . [c]ourt rejected [the] common law principle of the plain meaning rule . . . ." 46 H.R. Proc., Pt. 10, 2003 Sess., p. 3325. Representative Robert Farr, one of the chief proponents of the bill, spoke in favor of the bill and explained that its purpose was "to restore the law in Connecticut to what it was before the recent Supreme Court [decision in *Courchesne*]." Id., p. 3326. Representative Robert M. Ward, another proponent of the bill, added: "[T]his bill that is before us, which I hope becomes a law, would say that [the] court[s] must, in the first instance, read the language that we wrote and apply it with its regular normal meaning. If there are words of art, apply . . . the usual meaning to those words of art, but in the first instance, [the words mean] what . . . we have said as long as it isn't contradicted by other language or ambiguous. When it is ambiguous, it is clearly the responsibility of the court to interpret that ambiguity and often the court . . . resort[s] to a review of what was said as legislative

history, what was said on the floor of this House of Representatives, what's said on the floor of the Senate and at times, even . . . what was said in committee.

"That won't change under this bill, but it will put us back to the standard that [existed] before . . . ." Id., pp. 3332–33.

Senator Andrew J. McDonald introduced the bill on the floor of the Senate and explained its purpose as follows: "Historically, the courts of the [s]tate of Connecticut have interpreted our statutes [pursuant to] several rules of statutory construction. . . . [O]ne of the prime rules [among them] is something called the [p]lain [m]eaning [r]ule.

"And without going into great detail about the [p]lain [m]eaning [r]ule, it essentially says that if a statute is on its face, clear and unambiguous, and interpreting it in light of that clear and unambiguous language [it] would not yield absurd or unworkable results, the courts are not permitted to look beyond the language in the statute itself for purposes of determining what our legislative intent was in adopting that legislation. . . .

"In the *Courchesne* . . . decision, the Supreme Court in a five to two ruling retrenched from that traditional rule of statutory construction and in doing so, the court essentially indicated that in every instance, it was the obligation . . . of a court . . . to look to the broader context surrounding the adoption of any particular legislation." 46 S. Proc., Pt. 10, 2003 Sess., pp. 3190–91. Senator McDonald further stated: "[I]n case this bill does actually pass . . . let me be very clear for the purposes of legislative intent, that if this bill passes, it is the intent [of the legislature] to overrule the portion of [*Courchesne*] which recanted or retrenched from the [p]lain [m]eaning [r]ule under the rules of statutory construction." Id., p. 3193. Senator John McKinney observed that, by adopting House Bill

No. 5033, the legislature is "saying bring back the plain meaning rule . . . ." Id., p. 3222.

It is perfectly clear from this legislative history that the sole purpose of the legislature in enacting § 1-2z was to *restore* the plain meaning rule that had existed prior to *Courchesne.* There is nothing in the legislative history to suggest that the legislature also intended to overrule every other case in which our courts, prior to the passage of § 1-2z, had interpreted a statute in a manner inconsistent with the plain meaning rule, as that rule is articulated in § 1-2z. We are unwilling to impute to the legislature such a sweeping purpose in the absence of convincing evidence of that purpose. Because neither the language nor the legislative history of § 1-2z provides any such evidence, we conclude that § 1-2z does not overrule our prior case law importing a final judgment requirement into § 31-301b.

## III

The parties finally claim that, even if § 1-2z does not overrule our precedent importing a final judgment requirement into § 31-301b, we nevertheless should do so. The parties contend that the final judgment requirement finds no support in the language of § 31-301b, that it frequently is a difficult requirement to apply and that sound policy reasons militate in favor of its abandonment.[20] We decline the parties' invitation to revisit our case law incorporating a final judgment requirement into § 31-301b.

As we have explained, this court consistently has declined to overrule our cases, which date back to 1989,

---

[20] For example, the parties contend that permitting an immediate appeal on the issue of compensability, which often is the key issue in dispute, is most consistent with the goal of the Workers' Compensation Act "to facilitate [the] speedy, efficient and inexpensive disposition of matters covered by the act . . . ." (Internal quotation marks omitted.) *Del Toro* v. *Stamford,* 270 Conn. 532, 541, 853 A.2d 95 (2004).

that have construed § 31-301b to require a final judgment. Moreover, in *Hall* v. *Gilbert & Bennett Mfg. Co.*, supra, 241 Conn. 297–98, we expressly relied on the fact that, despite ample opportunity to do so, the legislature had taken no action to correct our interpretation of § 31-301b. To be sure, "we have, on occasion, questioned the use of the legislative acquiescence rule as a tool by which to divine legislative intent . . . in cases in which, following our decision on a particular issue, the legislature has had insufficient time to respond before we are again called [on] to consider the same or a sufficiently related issue." (Citation omitted; internal quotation marks omitted.) *Desena* v. *Waterbury*, 249 Conn. 63, 83 n.22, 731 A.2d 733 (1999). This case, however, is not such a case. We find it highly significant that the legislature has failed to act in the eighteen years since this court first concluded that § 31-301b contains a final judgment requirement. The fact that, in *Hall*, we expressly relied on the legislative acquiescence rule in rejecting a claim identical to the claim in the present case also is highly significant. Indeed, in view of our reliance on the legislative acquiescence rule in *Hall* and the fact that approximately ten more years have passed since our decision in *Hall* without any corrective action by the legislature, we do not see how we reasonably could decline to follow that rule today, if it is to retain any force at all. In sum, it is the legislature, and not this court, that is best suited to entertain the argument of the parties and amici that appeals under § 31-301b should not be limited to final judgments of the board.[21]

---

[21] We acknowledge that, for the reasons set forth in part II of this opinion, the finality requirement that has been imposed under § 31-301b, first by the Appellate Court and then by this court, fairly may be described as resting on dubious interpretative underpinnings. Nonetheless, this court's consistent and long-standing application of the requirement, even in the face of specific requests to abandon it, has been followed by legislative silence. This history compellingly counsels in favor of an inference of legislative acquiescence. We cannot, however, say with any confidence that the legislature also has been aware of how we came to impose the final judgment requirement

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

BORDEN, J., with whom KATZ, J., joins, concurring. I agree with and join the well reasoned majority opinion. I write separately and briefly to underscore two points.

First, as the majority opinion aptly notes, General Statutes § 1-2z was enacted by the legislature to overrule that part of this court's decision in *State* v. *Courchesne*, 262 Conn. 537, 567–78, 816 A.2d 562 (2003), in which we stated that, as part of the judicial task of statutory interpretation, we would not follow the plain meaning rule, which required a threshold showing of linguistic ambiguity as a precondition to consideration of extratextual sources of the meaning of legislative language. In enacting § 1-2z, the legislature barred this court from consulting extratextual sources, such as legislative history, unless and until we determine that the statute is ambiguous based on its language and related statutory language.

It is ironic that the legislature, in enacting § 1-2z, felt it necessary to put into the legislative history of that section that it intended to overrule our decision in *Courchesne*. As the majority notes, Senator Andrew J. McDonald stated: "[L]et me be very clear for the purposes of legislative intent, that . . . it is the intent [of the legislature] to overrule the portion of *State* v. *Courchesne* [supra, 262 Conn. 567–78] which recanted or retrenched from the [p]lain [m]eaning [r]ule under rules of statutory construction"; 46 S. Proc., Pt. 10, 2003

under § 31-301b, in contradiction of the plain statutory language and based originally on nonjurisdictional rules of appellate practice. Furthermore, all of the parties and amici in this case, who represent all facets of the workers' compensation spectrum, have urged us to reconsider and reject the final judgment requirement in favor of the plain language of § 31-301b. Under the circumstances, however, we are constrained to defer to the legislature as the proper forum for the arguments advanced by the parties and amici.

Sess., p. 3193; and Senator John McKinney stated that the legislature "[is] saying bring back the plain meaning rule . . . ." Id., p. 3222; see also 46 H.R. Proc., Pt. 10, 2003 Sess., p. 3325, remarks of Representative John E. Stone, Jr. (introducing House Bill No. 5033, entitled "An Act Concerning Statutory Interpretation," by describing it as "a relatively simple proposal . . . in response to a Supreme Court decision . . . in which the . . . [c]ourt rejected [the] common law principle of the plain meaning rule"); 46 H.R. Proc., supra, p. 3326, remarks of Representative Robert Farr (explaining that purpose of bill was "to restore the law in Connecticut to what it was before the recent Supreme Court [decision in *Courchesne*]"). An additional irony is that we have been forced to conclude that § 1-2z itself is ambiguous in order to consult its legislative history so as to determine its meaning as applied to the present case.[1]

The second point that I wish to underscore is that, as the majority also aptly notes, all the parties and the amici curiae in the present case, who represent all parts of the workers' compensation spectrum, have urged us to return to the plain language of General Statutes § 31-301b. Furthermore, the majority opinion makes clear how jurisprudentially fragile the underpinning of the final judgment rule is in the workers' compensation context. I respectfully urge, therefore, that now is the time for the interested groups and the legislature to revisit the question of whether a final judgment should be a subject matter jurisdictional requisite for an appeal from the workers' compensation review board.

---

[1] Indeed, the only way that we definitively know that § 1-2z was intended to overrule *Courchesne* is by consulting its legislative history.